931 F.2d 56
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
NORTH COAST AVIATION, INC., Petitioner-Appellant,
v.
James B. BUSEY, Administrator, Federal Aviation
Administration, National Transportation Safety
Board, Respondents-Appellees.
 Nos. 90-3652, 90-3838.
 United States Court of Appeals, Sixth Circuit.
 April 19, 1991.
 
 Before DAVID A. NELSON and SUHRHEINRICH, Circuit Judges, and HACKETT, District Judge.*
 PER CURIAM.
 
 
 1
 Petitioner-appellant North Coast Aviation, Inc. (North Coast) appeals the National Transportation Safety Board's (NTSB; the Board) order, which affirmed the Federal Aviation Administration's (FAA) emergency order of revocation of North Coast's taxi/commercial operating certificate. For the reasons stated below, we affirm the NTSB's order.
 
 
 2
 * On July 16, 1990, the administrator of the FAA issued an emergency order of revocation relative to North Coast's part 135 air taxi/commercial operating certificate. The FAA based its decision on the improper acts of Donald Evans (Evans), who owned twenty-five percent of North Coast and served it as a pilot, director of operations, and vice president.
 
 
 3
 Prior to the revocation, North Coast had a contract to deliver the New York Times each Sunday through Friday from Cleveland, Ohio, to Youngstown, Ohio, and Hamilton, Ontario. The flight normally departed Cleveland at 11:30 p.m. and returned there at 2:55 a.m. the following morning. North Coast's pilots usually used Piper Navaho N66866 for the delivery, but if that aircraft was unavailable, Piper Navaho N66906 would complete the run.
 
 
 4
 Around 11:15 p.m. on April 8, 1990, Evans became aware that he could not use any of North Coast's airplanes to make that night's delivery to Youngstown and Hamilton. N66866, the normal aircraft for the trip, was in maintenance for its 100-hour inspection; the flight would put N66906 over its 100-hour maintenance inspection; and another aircraft, N61518, had two mechanical discrepancies in its log that reduced its safety factor for flying.
 
 
 5
 Evans then determined that N66866's 100-hour maintenance inspection was substantially complete. If he departed and returned to Cleveland unnoticed in the early hours of April 9, 1990, the airplane's remaining service work could be finished later in the day and the maintenance logs signed off. Accordingly, Evans disconnected the Hobbs meter on N66866, which measures the aircraft's in-flight hours, and he departed for Hamilton. When he landed there, Canadian customs officials correctly logged the arrival of N66866. When FAA inspectors later confronted Evans with those customs records, he passed them off as clerical errors and claimed that he had actually flown N66906 that night.
 
 
 6
 When Evans returned to Cleveland, he waited for the cargo personnel to leave, and then returned N66866 to its exact previous position in the airplane hangar. He reconnected the Hobbs meter and closed the hangar door, all to disguise the fact that he had removed N66866 and used it for the delivery run before the completion of its 100-hour inspection.
 
 
 7
 Evans then began to cover the paper trail that follows each airplane and flight. He filed his report for the night of April 8-9, 1990, before anyone at North Coast had the opportunity to read it. He then altered the aircraft log and returned it to the maintenance desk.
 
 
 8
 Again, on the evening of April 9, 1990, there were no North Coast airplanes available to Evans for the run to Youngstown and Hamilton. He, therefore, retraced his steps from the night before and repeated the same illegal procedures. Evans told no one at North Coast of the dilemma that he faced in making the two delivery trips, and no one apparently had knowledge of his unlawful flights with N66866.
 
 
 9
 On April 11, 1990, Evans received word that N66866's 100-hour inspection was complete and the airplane available for the evening run. When he completed his deliveries and returned to Cleveland around 3:00 a.m. on April 12, 1990, maintenance inspectors from the FAA met Evans in order to conduct ramp inspections of North Coast's aircraft. After a review of the maintenance logs, airplanes, customs records, and fuel invoices, the inspectors eventually determined that North Coast had operated N66866 before completion of its 100-hour inspection.
 
 
 10
 On April 20, 1990, Evans and John L. Delassus (Delassus), the president and fifty percent owner of North Coast, presented themselves to the Cleveland Flight Standards district office. There, Evans submitted a thirteen-page handwritten statement in which he admitted disconnecting the Hobbs meter, falsifying flight records, and operating N66866 when it was supposed to be out of service for its 100-hour inspection.
 
 
 11
 On July 16, 1990, the FAA issued an emergency order of revocation of North Coast's part 135 air taxi/commercial operating certificate. The order, which became effective upon service, listed ten violations of FAA regulations and focused on the intentional falsification of documents and the operation of an aircraft which had not been maintained in compliance with the manufacturer's recommended maintenance. The FAA predicated its revocation upon a finding that North Coast lacked "the degree of care, judgment and qualifications required of the holder of an Air Taxi/Commercial Operating certificate, and that aviation safety and the public interest require the revocation of that operating certificate" (FAA Order of Revocation at p. 3). The FAA also revoked Evan's pilot's license.
 
 
 12
 North Coast filed a notice of appeal of the order of revocation to the NTSB pursuant to 49 C.F.R. Sec. 821.55 on July 18, 1990. The FAA notified the NTSB of the appeal by letter on July 20, 1990. The NTSB received the letter on July 24, 1990, and Judge Jimmy N. Coffman, an administrative law judge (ALJ) of the NTSB, held a hearing in Cleveland on July 26, 1990. Evans and Delassus gave testimony at that hearing. Evans testified that as of the date of the hearing, he was a ground instructor for North Coast's pilots. Delassus stated under oath that neither he nor anyone at North Coast had knowledge of Evan's illegal acts, and that the company's policy was to "broker a trip" to another company when all North Coast's airplanes were down for maintenance. He believed Evans operated alone. Delassus further testified that since the events of April 8-10, 1990, North Coast had removed Evans from all flight-related activities.
 
 
 13
 Judge Coffman held at the conclusion of the hearing that Evans acted alone and without North Coast's knowledge. He ordered the reversal of the FAA's order of revocation and North Coast's operating certificate returned.
 
 
 14
 The FAA, refusing to return North Coast's operating certificate, filed a notice of appeal of the ALJ's order to the full NTSB on July 27, 1990. North Coast then filed in the Sixth Circuit Court of Appeals (1) a petition for mandamus to enforce the ALJ's order, and (2) a petition for expedited review. On August 8, 1990, this court ordered an expedited review of the appeal and dismissed the petition for mandamus. The court ordered a stay of the emergency order of revocation on August 10, 1990, effective until the NTSB issued its opinion on the appeal relative to the ALJ's order.
 
 
 15
 In the meantime, the parties had submitted their appellate briefs to the NTSB. On August 11, 1990, North Coast filed a supplemental brief, but the Board declined to accept it after respondents filed a motion to strike. On September 24, 1990, the NTSB issued its opinion and order reversing the ALJ and affirming the FAA's emergency order of revocation of North Coast's operating certificate. The NTSB found Evans's part ownership of North Coast and his position of substantial control over its day-to-day operations a factor in rendering the company responsible for the improper flights of N66866. The Board also noted that subsequent to Evans's illegal acts, North Coast had failed to remove him in title and fact from authority and control over the company. "The company's failure to insulate its operations from Mr. Evans tends to validate the Administrator's position that [North Coast] was unable or unwilling to act responsibly" (NTSB Opinion and Order at p. 7).
 
 
 16
 North Coast then appealed to this court on September 25, 1990, and filed a motion to stay the emergency order of revocation. The court denied the motion to stay and the matter is now before us pursuant to 49 U.S.C. Sec. 1486(a).
 
 II
 
 17
 North Coast argues that the FAA presented no evidence to support its finding that a public safety emergency existed that required the immediate revocation of the Part 135 operating certificate. This issue, however, is moot in light of this court's order of August 10, 1990, which stayed the emergency order of revocation, and the subsequent entry of the NTSB order.
 
 
 18
 North Coast then contends that the NTSB erred by failing to affirm the findings of the ALJ, who heard nine hours of testimony and was privy to the credibility of the witnesses. Citing Erickson v. NTSB, 758 F.2d 285 (8th Cir.1985), and 49 C.F.R. Sec. 821.32, North Coast notes that the FAA bears the ultimate burden of persuasion to justify its revocation of an air carrier license and that, in this case, the FAA failed to carry that burden.
 
 
 19
 North Coast also asserts that the FAA did not present any evidence that Evans acted within the scope and course of his employment or that North Coast acquiesced in or ratified Evans's acts. In support of this contention, North Coast notes that pursuant to Ohio law, the doctrine of respondeat superior does not hold an employer liable for the act of an employee unless the employee acted within the scope of employment and the employer had control and direction over the employee's conduct. Rogers v. Allis-Chambers Mfg. Co., 153 Ohio St. 513, 526, 92 N.E.2d 677 (1950).
 
 
 20
 "The findings of fact by the Board or the Secretary of Transportation, if supported by substantial evidence, shall be conclusive." 49 U.S.C.App. Sec. 1486(e); Connaire, Inc. v. Secretary, U.S. Dept. of Transportation, 887 F.2d 723, 727 (6th Cir.1990). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Willbanks v. Secretary of Health and Human Services, 847 F.2d 301, 303 (6th Cir.1988) (quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)). Furthermore, an administrative decision supported by substantial evidence "is not subject to reversal merely because substantial evidence would have supported an opposite decision." Willbanks, 847 F.2d at 303 (quoting Mullens v. Bowen, 800 F.2d 535, 545 (6th Cir.1986)).
 
 
 21
 Substantial evidence in this case supports the NTSB's conclusion that North Coast is liable for the acts of Evans.[1] In Ohio, as in most jurisdictions, the "test of a master's liability is whether the servant's act was performed while engaged in the employment service and while carrying on the master's business." Taylor v. Doctors Hospital, 21 Ohio App.3d 154, 486 N.E.2d 1249, 1251-52 (1985). See also, Rogers v. Allis-Chambers Mfg. Co., 153 Ohio St. 513, 526, 92 N.E.2d 677 (1950). Evans conducted the illegal flights to Youngstown and Hamilton while carrying on North Coast's business. He did not commit these acts while on his own business or pleasure, but rather to complete North Coast's contract run to deliver the New York Times.
 
 
 22
 The inquiry does not end there, however, because the holder of a Part 135 certificate, itself, must conduct its operations with a high degree of safety. In M.O. Ehredt d/b/a Artic Guide, NTSB Order EA-1297, 3 N.T.S.B. 1875 (1979), the Board stated
 
 
 23
 the ultimate responsibility rests with the holder of the Operational Certificate.... This responsibility cannot be eschewed by saying that this has been delegated to another. Delegation of course can take place, however the ultimate responsibility still resides with the holder of the Certificate. Further, under the Federal Aviation Regulations, in the definitions in the Federal Aviation Act, the holder of this Certificate is considered, along with any particular Pilot or employee, to be the operator of that particular flight, and that he authorizes or causes, by virtue of being the holder of the Certificate, the particular operation. This, of course, not only follows under the definitions of the Regulations, but also under general principles of the law as it appears in the Master-Servant Relationship or in an agency relationship.
 
 
 24
 3 N.T.S.B. at 1888-89.
 
 
 25
 In connection with the revocation of a commercial operator certificate, the Civil Aeronautics Board stated
 
 
 26
 [t]he Board has previously held that management cannot escape responsibility for actions of its employees within the scope of their employment by disclaiming knowledge of their actions, and that a carrier must bear responsibility for the serious omissions and commissions of its agents and employees.... Transcending its responsibility under principles of agency is its positive duty to place in key positions affecting air safety men of responsibility and integrity and to exercise the degree of supervision over them that will insure the high degree of safety required of a commercial operator. Its failure to do so, demonstrates a lack of those qualifications that must be demanded of the holder of a certificate.
 
 
 27
 Admiral Air Service, CAB Order No. S-1153, 36 C.A.B. 1033, 1040 (1962) (citations omitted).
 
 
 28
 The NTSB order in this suit reflects the Board's finding that North Coast's acts showed that it was unable or unwilling to act in the responsible manner required of Part 135 Certificate holders. The NTSB's decision is well grounded in law and based on substantial evidence.
 
 III
 
 29
 North Coast argues that the NTSB erred in failing to accept North Coast's supplemental brief, filed on August 11, 1990. The supplemental brief corrected grammatical and spelling errors, and informed the Board that North Coast had removed Evans from all control of flight operations and that he was later terminated from any employment and involvement with the carrier. North Coast contends that this supplemental brief was crucial to its case because the NTSB based its opinion in large part upon Evans's continued employment at North Coast in a position of power and control. Citing Hooper v. National Transportation Safety Board, 841 F.2d 1150 (D.C.Cir.1988) and Green Country Mobilphone, Inc. v. Federal Communications Commission, 765 F.2d 235 (D.C.Cir.1985), North Coast claims that the Board's rejection of the supplemental brief was arbitrary and capricious and constitutes a failure of the NTSB to enforce its procedural rules uniformly.
 
 
 30
 The facts of this suit, however, differ from those in Hooper and Green Country. While the Hooper court held that "an agency's failure to enforce ... a procedural rule uniformly is arbitrary and capricious", 841 F.2d at 1151, that court relied upon the Board's admission in its pleadings that "the NTSB General Counsel appears to have departed from this policy [of dismissing late pleadings] on occasion and accepted untimely briefs without a finding of good cause." Id. Likewise, in Green Country the court took notice of several specific instances in which the FCC had departed from its procedural rules without clear explanations. The court held that because the Commission had not invoked the rule consistently, its application in Green Country was arbitrary and capricious. 765 F.2d at 238-39.
 
 
 31
 In the instant case, the regulations governing the procedure for appeals from emergency revocations, 49 C.F.R. Sec. 821.57, provide that the appellant shall file a brief with the Board within five days after the filing of the notice of appeal. A responsive brief is due ten days after service of the appellate brief. Furthermore, the briefing requirements of 49 C.F.R. Sec. 821.48(b), (c), (d), (e), (f), and (g) apply in appeals from emergency procedures. Section 821.48(d) provides for the filing of a reply brief within 30 days after service of the appellate brief. Section 821.48(e) then provides that "[n]o further briefs may be filed, except upon a showing of good cause therefor."
 
 
 32
 North Coast does not argue that it complied with the regulation or that it made the requisite showing of good cause. Instead, it contends that the NTSB fails to enforce its procedural rules uniformly and erred in granting respondents' motion to strike. North Coast, however, cites no specific instances of the Board's arbitrary and capricious application of the filing regulations. Furthermore, the NTSB has not admitted in this case, as it candidly stated in Hooper, that the Board inconsistently applies the regulations. North Coast's argument, therefore, is without foundation. Without admissions by the Board or citations to other NTSB cases, this court cannot conclude from the record and arguments in this case that the NTSB arbitrarily and capriciously applied its regulations relative to North Coast.
 
 IV
 
 33
 North Coast also argues that the Board failed to review and dispose of the emergency order within the 60 days mandated by 49 U.S.C. Sec. 1429(a), so that the NTSB order is null and void.
 
 49 U.S.C.App. Sec. 1429(a) states in part:
 
 34
 The filing of an appeal with the National Transportation Safety Board shall stay the effectiveness of the Secretary of Transportation's order unless the Secretary of Transportation advises the national Transportation Safety Board that an emergency exists and safety in air commerce or air transportation requires the immediate effectiveness of his order, in which event the order shall remain effective and the National Transportation Safety Board shall finally dispose of the appeal within sixty days after being so advised by the Secretary of Transportation (emphasis added).
 
 
 35
 The regulations governing the procedural rules applicable to emergency proceedings, 49 C.F.R. Sec. 821.54, provide in part:
 
 
 36
 (b) Effective date of emergency. The procedure set forth herein shall apply as of the date when the Administrator's written advice of the emergency character of his order has been received by the Office of Administrative Law Judges or by the Board.
 
 
 37
 (c) Computation of time. Time shall be computed in accordance with Sec. 821.10, including the provision that Saturdays, Sundays, and legal holidays of the Board shall always be counted in the computation.
 
 
 38
 The regulation governing the computation of time, Sec. 821.10, provides that
 
 
 39
 [i]n computing any period of time prescribed or allowed by this part, by notice or order of the Board, or a law judge, or by any applicable statute, the date of the act, event, or default after which the designated period of time begins to run is not to be included in the computation. The last day of the period so computed, is to be included unless it is a Saturday, Sunday, or legal holiday for the Board, in which event the period runs until the end of the next day which is neither a Saturday, Sunday, nor a legal holiday for the Board.
 
 
 40
 It is clear from both the statute and the regulations that the date the sixty days begins to run is the date when the NTSB receives the notice of appeal from the FAA. The statute specifically states that the time begins to run after the Secretary of Transportation advises the Board. Further, regulation 821.54 defines the effective date of the emergency as the date the Administrator's written notice is received by the Board. In this case, therefore, time began to run on July 24, 1990, the date the Board received the notice. Sixty calendar days from that date was September 22, 1990, a Saturday. Relying upon Sec. 821.10, the ending date of the period must be the next regular business day for the Board. In this case, that date was Monday, September 24, 1990, the date of the Board's order. Consequently, the NTSB's order is timely.
 
 
 41
 For the foregoing reasons, the order of the NTSB hereby is AFFIRMED.
 
 
 
 *
 The Honorable Barbara Hackett, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Because substantial evidence supports the NTSB's holding that Evans acted within the scope of his employment, the court does not reach the issue of whether Ohio or federal law controls the question of respondeat superior tort liability in this matter